[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
This appeal is brought by Christine R. Miller, Appellant, from a judgment of the Marion Municipal Court for Marion County, Ohio, denying her motion to suppress the results of a chemical breath/alcohol test. Although this case was originally assigned to the court's accelerated docket, pursuant to Loc.R. 12(5) we elect to issue the following opinion.
On January 16, 1998, Miller was charged with driving under the influence of alcohol and driving with an illegal concentration of alcohol in her breath, in violation of R.C. 4511.19(A)(1) and (3). A test of Miller's breath/alcohol level showed a .121 concentration of alcohol per 210 liters of her breath. On February 12, 1998, Miller filed a motion to suppress the results of the breath/alcohol test, claiming, inter alia, that the procedure used by the Ohio Department of Health ("ODH") for certification of the calibration solution was inadequate to ensure its reliability. On April 9, 1998, the parties in this case stipulated to certain facts involving the calibration solution used in Miller's case. Specifically, the parties agreed to submit to the court the testimony of Dr. Craig Sutheimer, Deputy Director, Chief Toxicologist and Chief of the Alcohol Testing Program for the ODH which was taken in another case.[1] The parties agreed that Dr. Sutheimer would testify no differently on the issue of the ODH's protocol for certifying the calibration solution at issue in Miller's case as in other previous cases involving the same batch solution.[2] The parties also stipulated to the information contained in the deposition testimony of Alfred E. Staubus, Ph. D., Pharm. D., relative to multiple versus single-point calibration procedures used by manufacturers of calibration solutions.
On April 9, 1998, a hearing on Miller's motion to suppress was held at which the stipulations of the parties were admitted into evidence and the matter was submitted to the court for decision. On May 28, 1998, the trial court overruled Miller's motion to suppress. Miller was subsequently found guilty by the trial court of driving with an illegal concentration of alcohol in her breath, in violation of R.C. 4511.19(A)(3), and was sentenced accordingly.
Appellant now claims, "[t]he trial court erred by overruling Defendant's motion to suppress and exclude Defendant's BAC test results [sic]."
Generally, the admissibility of breath test results depends on whether the state has substantially complied with the regulations promulgated by the ODH. See O.A.C. 3701-53-04; Statev. Plummer (1986), 22 Ohio St.3d 292; Defiance v. Kretz (1991),60 Ohio St.3d 1, 3. In this case, Appellant does not dispute that the state substantially complied with O.A.C. 3701-53-04. Instead Appellant's motion to suppress challenged the admissibility of her breath test result by attacking the procedure used by the director of health in certifying or "approving" the batch of ethyl alcohol solution which was used to calibrate the machine which was used to conduct her breath test.
According to O.A.C. 3701-53-04(A), a breathalyzer machine must be calibrated "no less frequently than once every seven days in accordance with the appropriate instrument checklist * * *." The regulation further provides that "[a]n instrument shall be checked using an instrument check solution containing ethyl alcohol approved by the director of health." [Emphasis added.] O.A.C. 3701-53-04(A)(4). The calibration solution contains a known concentration of alcohol referred to as a "target value" which when used in the breath testing machine should produce a readout equal to the target value of alcohol[3] per 210 liter of breath, plus or minus .005. The director of health issues a certificate for each batch of calibration solution distributed to the agencies, certifying the accuracy of the solution. If a breath testing machine processes the solution and produces a result that is too high or too low, the machine is taken out of service. O.A.C. 3701-53-04(A)(1).
The issue in this case is whether the director of heath for the ODH abused his discretion by certifying the alcohol content of certain batches of ethyl alcohol solution when the ODH did not independently test a statistically significant number of batch samples to establish the true alcohol content of the batch it certified but instead relied on the solution manufacturer's certificate of alcohol content.
The General Assembly has given broad power to the director of health in determining methods for alcohol testing. R.C. 3701.143
states:
 For purposes of section 4511.19 of the Revised Code, the director of health shall determine, or cause to be determined, techniques or methods for chemically analyzing a person's blood, urine, breath, or other bodily substance in order to ascertain the amount of alcohol, a drug of abuse, or alcohol and a drug of abuse in the person's blood, urine, breath, or other bodily substance. The director shall approve satisfactory techniques or methods, ascertain the qualifications of individuals to conduct such analyses, and issue permits to qualified persons authorizing them to perform such analyses. Such permits shall be subject to termination or revocation at the discretion of the director.
R.C. 3701.143 clearly vests all authority relative to determining the techniques and methods of chemically analyzing the alcohol content in a person's blood, urine and breath for purposes of R.C.4511.19, in the director of health. As stated earlier, the only requirement placed on the director of health regarding the calibration solution used in breathalyzer machines is that the director "approve" the solution. O.A.C. 3701-58-04(A)(1). While it is the director's obligation to approve the target value of the alcohol content of the solution pursuant to regulation, there is no regulation concerning how the director is to scientifically establish or verify that target value. Because no standard is set, we begin our review of the director's decision with the presumption that the decisions made by directors of governmental agencies are reasonable, unless Appellant can demonstrate no factual basis upon which the director could act as he did.Youngstown Sheet Tube Co. v. Maynard (1984), 22 Ohio App.3d 3,8; Citizens Committee v. Williams (1977), 56 Ohio App.2d 61, 70;Carroll v. Depart. of Admin. Services (1983), 10 Ohio App.3d 108,110.
A review of the deposition testimony of Dr. Sutheimer and Dr. Staubus[4] reveals the following facts. The ODH purchases the calibration solution used in breathalyzer machines throughout Ohio from independent manufacturers. These manufacturers certify the amount of alcohol in each batch they produce. Depending on the manufacturer, a batch of solution may contain between 1500 to 2000 bottles. Generally, four bottles from each manufactured batch are sent to the ODH. The ODH performs four tests on each bottle using gas chromatography, for a total of sixteen tests, to verify the manufacturer's result. If the ODH's tests produce a result within 5% (the allowed inter-laboratory variation) of the manufacturer's stated target value, the batch is certified by the ODH as evidenced by a "certificate of approval" and distributed to law enforcement agencies. The tests run by ODH are for verification purposes only and according to Dr. Sutheimer, are statistically inadequate to independently set a reliable target value for a batch of solution.
In his deposition testimony, Dr. Sutheimer stated that calibration solution batches were certified and approved by the director of health based on the manufacturers' certification and the ODH's verification tests which acted as a quality control measure. Although Dr. Sutheimer had not visited the manufacturers' facilities prior to certifying the batches, he knew the manufacturers did scientific testing to establish the target value and he also knew that the manufacturers were certified by governmental and/or reputable scientific organizations. For instance, Dr. Sutheimer knew that manufacturer RepCo[5] sent their batch solution to Northwest Toxicology ("Northwest") for testing and that Northwest was approved by the College of American Pathology and was certified by the National Laboratory Certification Program to do drug and alcohol analysis. Dr. Sutheimer was also aware that manufacturer Steifel[6] had been approved as a dermatologic company by the Food and Drug Administration. Moreover, the manufacturers had assured ODH that their testing procedures were more extensive than those employed by ODH.
Relying on the manufacturers' statements and reputations, and the manufacturers' apparent knowledge about the scientific methods necessary to guarantee the quality of their products, it was the director of health's practice to certify batches of solution if they passed ODH's own quality control tests. We find that although the director of health did not have affirmative proof demonstrating that the manufacturers used an accepted scientific method when determining the target value for its calibration solution, the director's reliance on the manufacturers' stated target values was reasonable given the reputation of the facilities and the fact that the solution passed ODH's own verification testing. Consequently, we find that at the time the director of health certified the batches at issue, there was some evidence available to the director which indicated that the calibration solution produced by the manufacturer was a reliable product. Also at that time, the director had no reason to doubt the validity of the target values or to otherwise question the integrity of the manufacturers scientific methods since there was no evidence that the target values assigned to the batches were incorrect. Thus, we conclude that the director of health acted within his discretion when approving calibration solution for use in breathalyzer machines even though he did so without independently testing a statistically significant number of batch bottles to set a true target value and instead performed only quality assurance testing.
Appellant makes the argument that the director improperly approved batches based on hearsay when it relied on the manufacturers' statement of the alcohol concentration in the solution. This argument assumes that the director of health is bound by the rules of evidence when performing his duties which is obviously not the case. Furthermore, as we have previously explained in State v. Walters (July 22, 1998), Seneca App. No. 13-98-04, unreported, Evid.R. 801(C) does not apply to the evidence presented in Appellant's suppression hearing since the manufacturers' certificates were not offered in evidence to establish the alcohol content of the solution. The manufacturers' certificates were simply one piece of information considered by the director of health when deciding whether or not to approve a batch of solution, a process to which Evid.R. 801(C) does not apply. We also note that the rules of evidence have limited application and do not apply to a trial court's preliminary rulings on admissibility of evidence. See Evid.R. 101(C)(1).
According to the testimony of Dr. Sutheimer, he personally visited the RepCo and Steifel manufacturing facilities in November of 1997 after the Municipal Court of Marietta, Ohio, suppressed breathalyzer test results on the basis that the director of health's certificate approving the calibration solution was untrustworthy. State of Ohio v. Norma Beardsley, et al. (Oct. 24, 1997), Marietta Mun. No. 97TRC4176, unreported.[7] After reviewing the process used at the manufacturing plants, it became evident to Dr. Sutheimer that the testing conducted by these facilities was inadequate to determine a true target value for the solution batches. Dr. Sutheimer testified that the most conservative scientific method of establishing the alcohol concentration of the ethyl alcohol solution would require manufacturers to test the lesser of: the square root of the total number of bottles in a batch, or 20 bottles, by random selection. However, Dr. Sutheimer agreed with statisticians who had studied the testing problem for the ODH that testing 7-8 bottles would be the minimum number scientifically "acceptable to set a theoretical true target" value. The manufacturers visited by Dr. Sutheimer were performing tests on less than the 7-8 bottles considered to be the minimum number acceptable to scientifically set a true target value.
Although the initial decision of the director of health to approve batches of calibration solution was not an abuse of discretion, once it became apparent that some manufacturers were not testing a scientifically reliable number of solution samples in order to set a true target value, we find that it became the duty of the director of health to either perform additional testing to ensure the reliability of the certificates previously issued or to recall the certificates. The evidence in this case revealed that the ODH did perform subsequent investigation and required the manufacturers to conduct additional testing in accordance with approved scientific methods in order to ensure the accuracy of the target values assigned to the solution batches at issue. In order to test the 7-8 bottles minimally required to establish scientifically reliable target values for each batch, ODH located sealed solution bottles from batch numbers 96901, 96902, 97010, and 97220, and sent them back to the manufacturers for additional testing. No additional bottles from batch number 96130 could be found; consequently, no further testing was performed to determine a true target value for this batch. Subsequent testing of batch numbers 97010 and 97220 established that the original "approved" batch solution certificates issued by the director of health had correct target values. Additional testing on batch numbers 96901 and 96902 indicated that the certificates issued by the director of health had target values which were incorrect by .001. For these batches, the certificates issued by the director of health should have predicted a readout of .099, rather than .100, grams of alcohol per 210 liters of breath, plus or minus .005.
From this information we conclude the following: (1) breathalyzer test results gathered from a machine calibrated using a solution of ethyl alcohol from batch number 96130 are unreliable even though the solution was originally approved by the director of health, since it has been subsequently learned by ODH that the alcohol concentration of the batch was not established through the use of proper scientific methods which would guarantee its accuracy and no further testing could be done to establish a correct target value; (2) breathalyzer test results gathered from a machine calibrated using a solution of ethyl alcohol from batch numbers 97010 or 97220, originally approved by the director of health pursuant to the exercise of his discretion, are reliable since it has been confirmed through subsequent scientific testing that these batches contain the amount of ethyl alcohol previously certified by the director of health, and; (3) breathalyzer test results gathered from a machine calibrated using a solution of ethyl alcohol from batch number 96901 or 96902 are reliable solong as the established error in the target value of .001 (the error in ODH's certificate which indicated a target value of .100 where it should have indicated a target value of .099) did not result in a breath testing machine being left in service when it should have been removed for maintenance (i.e., the machine readout of the calibration solution indicated a target value of .105 grams of alcohol per 210 liters of breath).
Applying our analysis to the case at hand, Appellant's breathalyzer test in this case produced a readout of .121 grams of alcohol per 210 liters of breath. The machine which produced this readout was calibrated using a solution of ethyl alcohol from batch 97220. Subsequent testing of this batch of solution has demonstrated that the solution contains the amount of alcohol certified by the director of health in his certificate of approval. Thus, Appellant has suffered no prejudice which would require the suppression of her breath test results. We find the municipal court acted properly in denying Appellant's motion to suppress. Appellant's assignment of error is overruled.
Having found no error prejudicial to the Appellant herein, in the errors assigned and argued, we affirm the judgment of the Municipal Court of Marion County.
Judgment affirmed.
 SHAW, P.J., and BRYANT, J., concur.
[1] Dr. Sutheimer's testimony is in the form of two depositions dated December 8, 1997 and January 8, 1998. These depositions are part of the record in State v. Linda C. Harris, Franklin Co. Municipal Court, Case No. M9709TFC-142093, et al. Also, submitted was a transcript from State v. Norma Beardsley, Marietta Municipal Court, Case No. 97 TRC 4176 dated October 20, 1997. We note that the transcript provided by Appellant of the hearing on the motion to suppress in Beardsley is missing a number of pages and contains smeared and unreadable print.
[2] Miller's breath test was performed using solution from batch number 97220. The testimony stipulated by the parties pertains to batch numbers 96901, 96902, 96130, 97010, and 97220.
[3] The appropriate reading may vary depending on the alcohol concentration of the batch certified by the director of health.
[4] Staubus' report comments on the use of single-point versus multiple-point gas chromatography when testing batch solutions. Staubus maintains the single-point method is not a reliable method for testing batch solutions. Dr. Sutheimer testified to the contrary. Mindful that the trial court is in the best position to judge the credibility of the witnesses and the weight of the evidence, State v. Fanning (1982), 1 Ohio St.3d 19,20, we are in accord with the municipal court's finding that:
 although two expert witnesses have reached different conclusions as to the reliability of single-point procedure gas chromatography, the Court is not persuaded that the approval by the Department of Health of batch solutions, based upon the use of single-point gas chromatography, constitutes an abuse of discretion.
[5] RepCo manufactured batches numbered 96901 and 96902.
[6] Steifel manufactured batches numbered 96130, 97010 and 97220.
[7] The court in Beardsley found that without facts before it evidencing the accuracy of the target values of the calibration solutions used in the defendants' cases, the solution and resulting test readouts were untrustworthy. Thus, faced with the possibility of similar future court rulings, the ODH sent Dr. Sutheimer to the manufacturers to examine and verify the scientific methods used to establish target values.